ALEXANDER HANDYSIDE *vs.* LEWIS J. POWERS.

Hampden.    Sept. 27. — Oct. 20, 1887.    C. ALLEN & HOLMES, JJ., absent.

In an action against the owner of a building for personal injuries occasioned to the plaintiff by a fall down an elevator well in the building, it appeared that the plaintiff, who was a plumber, was employed by A., a tenant of a portion of the building, to do some work therein; that, in the prosecution of his work, he opened a door leading into the well, it being unlighted and without a barrier, and fell, receiving the injuries complained of; that the door to the well had been provided with a lock, had been locked, and the key deposited in the defendant's office; and that this was the only key known by the defendant or his agent to exist, and it was found in its place in the defendant's office after the accident. There was evidence that a key had been procured by A. and used, but without the consent or knowledge of the defendant or his agent; and that the neglect of A. in unlocking the door and in leaving it unlocked caused the accident. The lease to A. gave him a right to the use of the elevator in common with the other tenants. *Held,* that the action could not be maintained.

The Pub. Sts. *c.* 104, § 14, as amended by the St. of 1882, *c.* 208, requiring safeguards to elevator openings, do not make the owner of a building who does not

---

* See St. 1887, *c.* 206.

comply with their provisions liable to a person injured by falling down an elevator well, in the absence of evidence that the act has been accepted by the city in which the building is located.

TORT, against the owner of a building in Springfield, for personal injuries occasioned to the plaintiff by a fall down the elevator well in said building. Trial in the Superior Court, before *Staples*, J., who reported the case for the determination of this court, in substance as follows:

The plaintiff testified as follows: " I am a plumber. On May 12, 1885, I was hired by M. J. King, a tenant of a portion of the building, to do some work therein. I was taken to the top or fourth floor, and was shown the sink and water-closet, and was told that the waste water to the sink and the aqueduct water failed to run. I went to my shop for some tools, and returned in half or three quarters of an hour with my tools. I went up to the third story. I understood that the tenement up stairs (meaning the fourth floor) had been vacant for a long time, and that the water had not run since the people came there. I thought the water must be shut off on the flight below, to keep the water from freezing, and I went there to see if the water was not shut off. This was the third floor. I tried the first door at the head of the stairs and found it locked. I then went to the next door, which was the door of the elevator well. Had my tools on my shoulder done up in a carpet bag; this door was not locked; went in ; the room was all dark. I thought this was the water-closet; there was no gas in it; had no idea there was an elevator there. I stepped on the threshold, and the next step I fell. There was no light ; I thought there must be a light in some place. It was totally dark; could not see anything. I had never been in this building above the basement before this day. I had no knowledge that there was an elevator in the building."

On cross-examination, the plaintiff testified as follows: " When I came back with my tools, I did not go to the fourth story. I went to find where the stop-cock was. I had not been told anything about the premises on that floor. I did not locate the water-closet on the fourth story to compare it with the water-closet on the third story. Had no light or match with me. I was going to set down my tools and go and get one. I put my foot down, and I thought I was going on to a floor, but I was down too far

before I could pull it back. I stepped off into total darkness. I felt for a floor with my foot. Some buildings are so constructed that they can shut off the water on the floor below, and it was my opinion that they had shut the water .off to keep the pipes from freezing. It was between two and three o'clock in the afternoon when I fell."

The defendant testified as follows: "I am the owner of the building where the accident happened. The basement, the fourth story, and the two front rooms on the third story, were leased to M. J. King."

By the terms of the lease, which was put in evidence, the leased premises were "the basement, the upper story, together with the two front rooms in the third story, of the granite block owned by said Powers, and known as 231 Main Street, in said Springfield." The lease gave " the use, in common with other tenants, of the stairways in said building, and the elevator. Provided, however, said King agrees to take care of and clean said stairways." The lease also contained the following clause : " that he [the lessee] will allow the lessor, his heirs and assigns, and their agents, at seasonable times, to enter upon said premises, and examine the condition thereof and make necessary repairs."

The defendant then testified as follows: " No other tenant than King used the elevator or had authority to use it. I had never given the elevator key on the third story to any one ; supposed it was at my office. Had no knowledge that there were two keys to the elevator door on this story. The elevator had never been used on that story, to my knowledge, since the building was built. On this floor, Mr. Hall occupied the two back rooms for sleeping rooms. Mr. King occupied one room, and Mr. Gates the other; they were sleeping rooms. The second story was occupied by R. G. Dun and Company's mercantile agency, and an insurance office in the rear, occupied by Mr. Clarke. The first floor was occupied by J. G. Mackintosh and Company's banking office; the basement was occupied by Mr. King as a saloon. There was no water-piping, or gas-piping, or stop-cock of any kind in the elevator well."

In answer to a question put to him by the court, he said: " Nobody on the first or second floors had anything in their

leases about the elevator. My cashier, Dwight Holland, had charge of this building. It was his duty to attend to the keys and tenants, and to do all necessary work. The fourth story was used by King for no other purpose than as a tenement to live in. Mr. Hall, who occupied the two back rooms on the third floor, has his residence in Brooklyn; he had charge of the Steam Power Company in the rear of my building, and came up once or twice a month, and when he was here he had the use of those rooms."

The defendant testified, on cross-examination, as follows: " I constructed the elevator at the time the building was built; and, after I left the building, a dummy elevator was put in the large elevator, and to run up through it, by some man who rented the saloon in the basement, before King became my tenant. I do not think.I gave any permission. I never objected to it. I frequently went on the premises. The building was entirely occupied by tenants."

Dwight Holland, called by the defendant, testified as follows: " I am the cashier of the defendant; have charge of this building. I knew where the key to the elevator door was at the time of the accident; it was at our office. I have possession of the keys to that building. After King moved out of the upper tenement, I examined all the doors, and found they were all locked. This must have been a year before the accident. I examined the elevator door in question, and found it locked; I never let any person have the key and never had any knowledge of any person having the key to this elevator door, on third floor. Nobody ever went to me for a key to it. There is a water-closet at the top of the stairs; the door of the elevator is around the corner, ten feet from it. The elevator on that story has never been used, so far as I know, since I have been with the defendant; I have been with him eighteen years."

On cross-examination, he testified that, so far as he knew, the elevator had not been in use on the third story since the defendant left the building, and that it was in use on that story at the time the defendant occupied the building. " I knew the key was at the office, because the keys have not been disturbed since. I have since looked for the key to this door, and found it in the box; it was after King told me of the accident; it might have been two weeks after. I took it and went up and locked the

door. I then put the key back in the box, and left it till a few days ago."

M. J. King, called by the defendant, testified as follows : " I am the person named in the lease. The defendant never gave me any key or anything for the use of the elevator in the third story. I got a key to it from Mr. Hall; cannot tell where he got it. I wanted to use it, and borrowed the key. I used the elevator regularly the winter previous to the accident. I used it the morning of the accident, I think. The defendant had no knowledge of the use of the elevator on the third floor while I was there. I did not know the plaintiff was going on the third floor."

On cross-examination, he testified as follows : " Hall used the elevator occasionally ; when he wanted to use it he used to ring the bell, pull the knob on the side of the elevator, and that connected with a bell in my saloon. I got the key of Hall about February. When I got through with it, I gave it back to Hall, and up to February, 1885, one of the rooms on the third story was occupied by the Edison Electric Light Company as an office, and as my tenant."

The defendant, being recalled, testified as follows : " I never gave a key to this elevator door to Hall ; I had no knowledge that he had a key to it ; never gave him the use of the elevator in any form, and never knew of his using it."

Dwight Holland, recalled, testified as follows : " I never let Hall have the key of the elevator door on this story ; never knew of his using it ; never knew of but one key to that elevator, and that was in the box in my possession."

The lease to King was made on November 3, 1882, and was in force at the time of the accident. The door to the elevator opened from the hallway and swung on perpendicular hinges, and had no trap-door or self-closing hatch or safety-catch. The only entrance to the fourth story was through the hallway on the third story. On the third story there was a bell knob on the inside of the elevator connecting with a gong in the basement. The elevator was closed in with doors opening into it from each story, and could not be seen from the hallway.

At the close of the evidence, the judge ruled that, upon the evidence, the plaintiff was not entitled to maintain his action, and ordered a verdict for the defendant.

If the ruling was right, the verdict was to stand; if wrong, the verdict to be set aside, and a new trial granted.

*J. B. Carroll*, for the plaintiff.

*T. M. Brown*, for the defendant.

DEVENS, J.   Without considering whether the plaintiff was an intruder or a licensee in entering on the premises, we do not find that there was evidence in the case of neglect on the part of the defendant.  The door to the elevator had been provided with a lock, had been locked, and the key deposited in the defendant's office.  This was the only key known by the defendant or his agent to exist, and it was found in its place in the defendant's office after the accident.  There was evidence that a key had been procured by King and used, but without the consent or knowledge of the defendant or his agent, and that the neglect of King in unlocking the door and in leaving it unlocked had been the cause of the injury.  But the act of King in obtaining a key without the knowledge of the defendant, and his subsequent carelessness, cannot be attributed to the defendant.

It is the contention of the plaintiff, that the Pub. Sts. c. 104, § 14, amended by the St. of 1882, c. 208, which requires that hoistways, hatchways, elevators, and well-holes upon every floor of a factory or mercantile or public building shall be protected by good and sufficient trap-doors or self-closing hatches and safety-catches, or such other safeguards as the inspectors of buildings shall direct, rendered it obligatory on the defendant to supply the safety appliances there described, and made him responsible if any injury occurred by a failure so to do.   It will not be necessary here to consider what is the construction of this section.   It is a part of an act for the inspection of buildings, and for the appointment of building inspectors in such towns or cities as shall accept the act, or certain sections of previous acts.   Whether it was ever accepted by the city of Springfield does not appear, nor does it appear that any directions were ever given by building inspectors.   The section cited does not have any connection with the question in the case at bar, as presented to us by the report.          *Judgment on the verdict.*